UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SUZY MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | 21 C 5494 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| SUSAN HALING, MICHELLE CASEY, DONALD EDWARDS, CHICAGO HOUSING AUTHORITY, MARK LISCHKA, MICHAEL MORAN, BOARD OF EDUCATION OF CITY OF CHICAGO, JONATHAN MAPLES, and DOES 1-10, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Suzy Martin brings this suit against Susan Haling, Michelle Casey, and Donald Edwards in their official capacities as Illinois state officials; the Chicago Housing Authority ("CHA") and two of its employees, Mark Lischka and Michael Moran, in their official and individual capacities; and the Board of Education of the City of Chicago and its employee, Jonathan Maples, in his official and individual capacity. Doc. 1. The complaint alleges that Defendants violated Martin's Fourteenth Amendment procedural due process rights by making false and stigmatizing statements about her participation in an alleged bribery and kickback scheme involving elevator contracts her business, Smart Elevators Co., held at the University of Illinois Chicago ("UIC"). *Ibid*. Edwards, Haling, Casey, and CHA move under Civil Rule 12(b)(1) to dismiss the suit for lack of subject matter jurisdiction, and all Defendants move under Civil Rule 12(b)(6) to dismiss for failure to state a claim. Docs. 32, 36, 38, 39, 41, 43. The Rule 12(b)(1) motions are denied, the Rule 12(b)(6) motions are granted, and Martin is given an opportunity to file an amended complaint.

1

**Background**

In resolving a Rule 12(b)(1) motion asserting a facial challenge to subject matter jurisdiction, as in resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, but not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (Rule 12(b)(6)); *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (Rule 12(b)(1)). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Martin's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Martin as those materials allow. *See Domanus v. Locke Lord, LLP*, 847 F.3d 469, 478-79 (7th Cir. 2017). In setting forth the facts at this stage, the court does not vouch for their "objective truth." *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

A. **OEIG Investigation and Report**

Martin is the owner and president of Smart Elevators, an elevator servicing and repair company operating in the Chicago area. Doc. 1 at ¶ 10. In October 2010, Smart Elevators began providing elevator and escalator services to UIC. *Id*. at ¶ 27. Smart Elevators's work at UIC increased in 2011 and 2012 and remained steady through 2016. *Id*. at ¶¶ 28-31.

On October 16, 2015, the Office of the Executive Inspector General for the Agencies of the Illinois Governor ("OEIG") received a whistleblower complaint alleging that Martin and Smart Elevators participated in a bribery and kickback scheme in which James Hernandez, a UIC employee in charge of its elevator payment and procurement systems, improperly directed work to Smart Elevators and paid it for services that it did not provide. *Id*. at ¶¶ 2, 34-37. The OEIG

opened an investigation and interviewed Martin on February 1, 2016. *Id*. at ¶¶ 35, 40. During its investigation, the OEIG discovered that Martin had written a series of checks to Hernandez's daughter from March 2013 through August 2015, which the OEIG suspected were bribes. *Id*. at ¶ 41. On March 4, 2016, UIC told Smart Elevators that it could no longer provide elevator services to UIC, *id*. at ¶ 44, and on March 17, Hernandez resigned from UIC, *id*. at ¶ 43.

On May 26, the OEIG referred its uncompleted investigation to the United States Attorney's Office for the Northern District of Illinois. *Id*. at ¶ 45. The U.S. Attorney's Office asked the OEIG to suspend its investigation, which it did. *Id*. at ¶¶ 46-47. The OEIG later learned that Smart Elevators had submitted a bid on a contract to provide elevator repair services to UIC. *Id*. at ¶ 47. The OEIG decided to issue a report "at th[at] time in order for UIC to be able to make an informed decision in its procurement process regarding Smart Elevators, rather than waiting until the U.S. Attorney's Office ha[d] concluded its case." *Ibid*.

On April 3, 2017, the OEIG and the Illinois Executive Ethics Commission ("EEC")—the governmental body that publishes OEIG reports—issued a non-public report finding that Martin and Hernandez "operated a kickback scheme in which Ms. Martin paid Mr. Hernandez at least $83,530 in kickbacks, and likely as much as $199,430," and violated the gift ban provision of the State Officials and Employees Ethics Act. *Id*. at ¶ 48. The report recommended that UIC "terminate any existing contracts and work orders with Smart Elevators, and bar Smart Elevators, or any other business operated by Suzy Martin, from future UIC contracts or work." *Id*. at ¶ 49.

B.  UIC "Shadow Debarment"

On April 24, 2017, UIC's Executive Director of University Ethics and Compliance stated that UIC would defer action on the OEIG report's recommendations until the U.S. Attorney's Office concluded its investigation. *Id*. at ¶ 56. According to Martin, UIC in fact decided to bar

3

her and Smart Elevators from any UIC work based on the OEIG report, thereby imposing a "shadow debarment." *Id*. at ¶ 67.

On May 2, 2018, the U.S. Attorney's Office issued a press release announcing federal bribery charges against Martin and Hernandez. *Id*. at ¶ 58. Eight months later, the EEC publicly released the OEIG report, and on January 3, Hernandez pleaded guilty to the federal charges. *Id*. at ¶¶ 59-60. On January 15, the OEIG released a public newsletter setting forth information about the OEIG report. *Id*. at ¶ 62.

On February 22, 2019, after a four-day jury trial, Martin was found not guilty of all charges. *Id*. at ¶ 64. The OEIG and the EEC have nonetheless refused to withdraw the OEIG report, on which UIC continues to rely to bar Martin and Smart Elevators from any UIC work. *Id*. at ¶¶ 65, 67. In October 2020, Martin wrote to the President of UIC to ask that he "make an independent assessment of her relationship with UIC in order to clear her name," but she never received a response. *Id*. at ¶ 68. In January 2021, UIC employees told a contractor that it would not be awarded any work at UIC if it used Smart Elevators as a subcontractor. *Id*. at ¶ 69.

C. **CHA Debarment**

In April 2019, a CHA contractor hired Smart Elevators as a subcontractor. *Id*. at ¶ 72. That month, the CHA Office of the Inspector General ("CHA OIG") learned of the OEIG report. *Id*. at ¶ 73. On April 17, CHA OIG Investigator Mark Lischka contacted UIC's Executive Director of University Ethics and Compliance, who told him that, while UIC had not officially debarred Martin and Smart Elevators, it was not awarding Smart Elevators any contracts in light of the OIEG investigation and the federal criminal charges. *Id*. at ¶¶ 74-75. The CHA OIG concluded that there was "strong and sufficient evidence" that Martin and Smart Elevators had operated a kickback scheme with Hernandez, and recommended that Martin and Smart Elevators be debarred from doing any business with CHA for three years. *Id*. at ¶ 76.

On October 16, Michael Moran, CHA's Chief Financial Officer and Acting Chief Procurement Officer, sent Martin a letter stating that CHA had determined—based on Hernandez's plea agreement, the OEIG's investigation, and the CHA OIG's investigation—that she and Smart Elevators were "non-responsible, and therefore, ineligible to enter into new contracts to perform services at CHA and CHA-related properties." *Id*. at ¶ 79. As a result, Smart Elevators's contracts with CHA were cancelled, and Martin and Smart Elevators remain ineligible to provide work to CHA. *Id*. at ¶ 81. In November 2020, Martin wrote to CHA's Chair of the Board of Commissioners asking that she clear Martin's name and reject the OEIG report's findings, but Martin never received a response. *Id*. at ¶ 80.

    D.    **CPS Debarment**

Smart Elevators began working as a subcontractor for Chicago Public Schools ("CPS") in 2017. *Id*. at ¶ 82. On January 22, 2020, Martin met with Jonathan Maples, the Chief Procurement Officer for the Chicago Board of Education, to discuss the allegations in the OEIG report. *Id*. at ¶ 86. On February 23, 2021, Maples issued a Notice of Proposed Debarment and Interim Restraints to Martin and Smart Elevators. *Id*. at ¶ 87. Citing the OEIG report and the transcripts from Martin's trial, the notice informed Martin and Smart Elevators that they were immediately suspended from performing under any existing Board contract; proposed that the Board's Chief Operating Officer impose interim constraints on Martin and Smart Elevators to make them ineligible to obtain any new Board business; and recommended that the Board's Chief Operating Officer seek Board approval to fully and permanently debar Martin and Smart Elevators. *Id*. at ¶¶ 88-89, 91. In her response to the notice, Martin denied any wrongdoing and requested a hearing before the Board, but no hearing was held. *Id*. at ¶ 92. Martin and Smart Elevators are currently ineligible to provide work to CPS. *Id*. at ¶ 93.

5

### E. Smart Elevators's Other Contracts

On March 6, 2019, just over a week after Martin's acquittal, the United States Department of the Navy terminated its suspension of Martin and Smart Elevators from performing work for the Navy. *Id*. at ¶ 71. In 2021, the United States Department of Justice awarded Smart Elevators a contract to perform elevator renovation services at the Metropolitan Correctional Center in Chicago. *Id*. at ¶ 70. In addition to its contracts with the federal government, Smart Elevators has contracts with private entities and various state agencies. *Id*. at ¶ 25.

## Discussion

### I. Rule 12(b)(1)

Several defendants challenge the court's subject matter jurisdiction over Martin's claims, but those challenges have no merit.

#### A. Article III Standing

Edwards and CHA argue that Martin, who brings this suit in her personal capacity, lacks Article III standing because she seeks relief on behalf of only Smart Elevators. Doc. 33 at 10-11; Doc. 42 at 9. The "irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation and internal quotation marks omitted). Edwards and CHA challenge only the third element, redressability. Doc. 33 at 10-11; Doc. 42 at 9. "Redressability 'examines the causal connection between the alleged injury and the judicial relief requested.'" *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 501 (7th Cir. 2005) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). "On a

motion to dismiss, a plaintiff need only plead that there is a substantial likelihood that the relief requested will redress the injury claimed." *Ibid*. (internal quotation marks omitted).

Edwards and CHA's argument fails because Martin seeks relief on her own behalf. Specifically, Martin alleges that UIC, CHA, and CPS imposed debarments that extended to both Smart Elevators and "any other business operated by Suzy Martin," Doc. 1 at ¶¶ 49, 67, 76, 79, 88-89, and she asks that the debarments "against Smart Elevators *and Martin*" be enjoined, *id*. at ¶¶ 116, 128, 141 (emphasis added). Because there is a substantial likelihood that Martin's alleged injury—disqualification from operating a business that can compete for contracts at UIC, CHA, and CPS—would be remedied by an injunction lifting the debarments against her, she satisfies Article III's redressability requirement. *See Spokeo*, 578 U.S. at 338; *Lac Du Flambeau*, 422 F.3d at 501.

**B.  Eleventh Amendment**

Edwards, Haling, and Casey argue that Martin's claims are barred by the Eleventh Amendment. Doc. 33 at 5-6; Doc. 40 at 7-9; Doc. 44 at 5-7. The Eleventh Amendment "bars actions in federal court against a state, state agencies, or state officials acting in their official capacities." *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin*., 603 F.3d 365, 370 (7th Cir. 2010). Interpreting the Eleventh Amendment, the Supreme Court held in *Ex parte Young*, 209 U.S. 123 (1908), that injunctive relief—but not monetary damages for past harms— is available in federal court against state officials sued in their official capacities. *See id*. at 159-60; *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521 (7th Cir. 2021) (explaining that "*Ex parte Young* … applies only when a plaintiff seeks prospective relief against an ongoing violation of federal law," and that, while "[i]njunctive relief is prospective relief …[,] monetary damages to remedy past harms" is not) (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997)); *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1050-51 (7th Cir. 2013)

(observing that a federal court cannot "direct a state to make payments … to remedy a past injury to a private party").

Edwards, the Chairman of UIC's Board of Trustees, argues that Martin's request for an injunction enjoining him from "enforcing any debarment" against and "canceling any existing contracts" with her and Smart Elevators, Doc. 1 at ¶ 116, "is really a claim for money damages in violation of [UIC's] Eleventh Amendment sovereign immunity," Doc. 33 at 5. According to Edwards, while the relief sought by Martin is "technically in the nature of a mandatory injunction to … accept[] and evaluat[e] [her] company's bids, the primary relief [she] seeks is the payment of money from the state." *Id*. at 9. That argument is wrong. The complaint focuses on Martin's inability to compete for bids, and her requested relief correspondingly seeks to remove that barrier by allowing her bids to be "accept[ed] and "evaluat[ed]." Doc. 1 at ¶ 116. The complaint does not request an injunction compelling any defendant to contract with Martin or to pay her. As she seeks only prospective injunctive relief, rather than "monetary damages to remedy past harms," Martin's injunctive relief claim against Edwards in his official capacity can proceed under *Ex parte Young*. *See Driftless Area*, 16 F.4th at 521.

Next, Edwards and Casey, the EEC's Executive Director, argue that Martin "impermissibly asks this Court to direct [] Illinois state entit[ies] on how to comply with Illinois law." Doc. 33 at 5; Doc. 44 at 5-7. Under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), the Eleventh Amendment precludes federal courts from exercising jurisdiction to grant either "prospective or retroactive" relief "when a plaintiff alleges that a state official has violated *state* law." *Id*. at 106; *see also James v. Madigan*, 373 F. App'x 619, 621 (7th Cir. 2010) ("Although *Ex parte Young* permits prospective relief against a state official to

8

ensure future compliance with federal law, this approach does not apply to claims under state law."). But Martin does not seek such relief.

True enough, Martin alleges that the EEC's decision to issue the OEIG report before the OEIG's investigation was complete, and without the report's conclusions being supported by "reasonable cause," was "improper and contrary to state law." Doc. 1 at ¶¶ 52-53. But those allegations are made as part of Martin's claim that the EEC's decision to issue the OEIG report deprived her of her federal due process right to "continue to work and contract" with UIC, CHA, and CPS. *Id*. at ¶ 103. It follows that Martin's claims against the EEC do not impermissibly ask the court to direct it to comply with Illinois law. *See Trump v. Wis. Elec. Comm'n*, 983 F.3d 919, 925 (7th Cir. 2020) (holding that federal courts can, consistent with the Eleventh Amendment, "decide whether [state officials'] interpretation of state law violated a provision of the federal Constitution," and observing that a complaint that is "anchor[ed] in alleged violations of state law" can still "present[] a federal question"); *Bennett v. Tucker*, 827 F.2d 63, 71 n.3 (7th Cir. 1987) (holding that *Pennhurst* "is no bar to the federal courts adjudicating" a suit in which "the plaintiffs do not ground their claim on the defendant's alleged failure to comply with state law [and instead] allege that the defendant has refused to comply with the dictates of the Due Process Clause," and explaining that "existing state procedures may be relevant in determining the dictates of due process").

As for Edwards, Martin alleges that UIC's informal decision to debar her deprived her of "an opportunity to rebut or appeal a[] formal decision by UIC," thereby impinging on her "existing liberty rights [under the Fourteenth Amendment] to continue to work and contract with UIC." Doc. 1 at ¶¶ 110, 114, 116. Edwards notes that Illinois statutes and regulations govern vendor debarment procedures for state agencies. Doc. 33 at 9; *see* 30 ILCS § 500/1-1 *et seq.*; 44

9

Ill. Adm. Code § 4.2005 *et seq*. But Martin alleges that UIC's "shadow debarment" process violated her federal due process rights, not Illinois's debarment procedures. Doc. 1 at ¶¶ 110-116. Accordingly, Martin's claims against Edwards do not impermissibly ask the court to direct UIC to comply with Illinois law. *See Bennett*, 827 F.2d at 71 n.3.

Last, Haling, the OEIG's Executive Inspector, argues that she cannot be sued under *Ex parte Young* because the OEIG was "not responsible" for publishing the OEIG report. Doc. 40 at 7-9. *Ex parte Young* applies only to state officials with the authority to perform the challenged state action. *See Young*, 209 U.S. at 157 ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act."); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir. 1992) (holding that *Ex parte Young* did not "support[] a suit against the Attorney General, who has never threatened the [plaintiffs] with prosecution and as far as we can tell has no authority to do so").

To support her view that she is not properly subject to suit under *Ex parte Young*, Haling cites the complaint's allegation that, "[i]n January 2019, … the EEC publicly released the OEIG Report." Doc. 1 at ¶ 59. Elsewhere in the complaint, however, Martin alleges that both the EEC and the OEIG *issued* the OEIG report. *Id*. at ¶ 48 ("On April 3, 2017 … the EEC and OEIG issued a report (the 'OEIG Report') … ."); *id*. at ¶ 52 ("The EEC and OEIG decision to issue the OEIG Report … ."). And the complaint alleges that the report's April 2017 issuance, undertaken by the EEC and the OEIG, violated her federal due process rights by causing UIC to refuse to do business with her. *Id*. at ¶¶ 66-67. Thus, even though Martin alleges that the OEIG was involved only in issuing the report, not in publicly releasing it, the OEIG was still responsible for

some of the state action of which she complains. Martin's injunctive relief claim against Haling therefore is permitted under *Ex parte Young*.

## II. Rule 12(b)(6)

Martin brings only federal claims, and those claims allege violations of her Fourteenth Amendment procedural due process rights—specifically, that Defendants deprived her of her "protected liberty interests in her continuing right to contract and work with UIC, CHA and CPS." *Id*. at ¶¶ 101-103, 112-114, 124-126, 137-139. "A procedural due process claim requires a two-fold analysis. First, [the court] must determine whether the plaintiff was deprived of a protected interest; second, [the court] must determine what process is due." *Leavell v. Ill. Dep't of Natural Res*., 600 F.3d 798, 804 (7th Cir. 2010). Focusing on the first element, Defendants argue that Martin's admission that Smart Elevators has other contracts defeats her submission that she has a protected liberty interest in contracting with UIC, CHA, and CPS. Doc. 38 at 10-11; Doc. 40 at 10-13; Doc. 42 at 10-13; Doc. 44 at 12-13.

Among the liberty interests protected by the Due Process Clause is an individual's right "to engage in any of the common occupations of life." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972). To state a due process claim for the deprivation of occupational liberty, a plaintiff "must [allege] that (1) [s]he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed[,] and (3) [s]he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001).

As to the third requirement, Seventh Circuit precedent holds that a plaintiff "suffer[s] a tangible loss of other employment opportunities" only when the defendant's stigmatizing conduct caused "the [plaintiff's] good name, reputation, honor or integrity [to] be called into question in a manner that makes it *virtually impossible* for the [plaintiff] to find new employment

11

in his chosen field." *Ibid*. (emphasis added); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) ("Liberty interests are impinged when someone's good name, reputation, honor or integrity are called into question in a manner that makes it virtually impossible for him to find new employment in his chosen field.") (internal quotation marks and alterations omitted); *RJB Props., Inc. v. Bd. of Educ. of Chicago*, 468 F.3d 1005, 1011 (7th Cir. 2006) (same). The "virtually impossible" standard excludes from the scope of an occupational liberty claim defamation that "merely result[s] in reduced economic returns and diminished prestige," *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985), or that "even … causes serious impairment of one's future employment," *Khan v. Bland*, 630 F.3d 519, 534 (7th Cir. 2010) (internal quotation marks omitted). *See Santana v. Cook Cnty. Bd. of Rev.*, 679 F.3d 614, 621 (7th Cir. 2012) ("Defamation by the government [] does not deprive a person of a liberty interest protected by the Fourteenth Amendment, *even when it causes serious impairment of one's future employment*.") (internal quotation marks omitted); *McMahon v. Kindlarski*, 512 F.3d 983, 988 (7th Cir. 2008) ("[I]t is well-established that mere defamation, while it may be the basis for a solid claim based on state law, does not deprive a person of liberty protected by the Fourteenth Amendment. This is true even when the defamation causes serious impairment of future employment opportunities.") (citation omitted); *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) ("[M]ere defamation by the government does not deprive a person of 'liberty' protected by the Fourteenth Amendment, even when it causes serious impairment of [one's] future employment.") (internal quotation marks omitted).

The complaint alleges that Smart Elevators currently has contracts with the Department of Justice, private entities, and state agencies, and that it is free to compete for contracts with the Department of the Navy. Doc. 1 at ¶¶ 25, 70-71. At the hearing on Defendants' motions,

Doc. 61, Martin confirmed that Smart Elevators performs work for state agencies. Given these admissions, it indisputably is not "virtually impossible for [Martin] to find new employment in [her] chosen field." *Doe*, 928 F.3d at 661. To the contrary, Smart Elevators's success in securing contracts in the elevator service and repair industry—including with state and federal governmental clients—shows, as a matter of law, that Martin has not been deprived of any occupational liberty interest. *See Khan*, 630 F.3d at 533-35 (holding that the plaintiff's debarment from renting properties under a Section 8 Housing Choice Voucher Program did not implicate a protected occupational liberty interest given that he "could still rent to non-Section 8 housing tenants and participate in other state or government assistance programs"); *Wroblewski v. City of Washburn*, 965 F.2d 452, 455-57 (7th Cir. 1992) (holding that the plaintiff, a Wisconsin marina manager, did not state a due process claim for deprivation of occupational liberty when the defendant municipality "effectively prevented [him] from obtaining *any* potential employment or subcontracting work in connection with [its] marina," which "required [him] to leave Wisconsin for a period of time to obtain employment," because those actions did not subject him to a "permanent exclusion from" employment in his occupation).

Because Martin fails to allege that she was deprived of a protected liberty interest, her due process claim necessarily fails. *See Khan*, 630 F.3d at 527 ("An essential component of a procedural due process claim is a protected property or liberty interest.") (internal quotation marks omitted). Pressing the contrary result, Martin cites *Medley v. Milwaukee*, 969 F.2d 312 (7th Cir. 1992), for the proposition that a protected occupational liberty interest is implicated "when a government contractor is debarred or otherwise precluded from further government work." Doc. 50 at 26. But in *Medley*, the Seventh Circuit held that the plaintiffs had not been deprived of a protected liberty interest when the City of Milwaukee's Housing Authority

13

debarred them from renting property through the city's Rent Assistance Program, reasoning that the debarment "did not foreclose their opportunity to contract with any local or state housing assistance programs or to lease their units to persons who were not in the Rent Assistance Program" and thus "did not effectively put them out of business." *Id*. at 318 (internal quotation marks and alterations omitted). *Medley* thus reinforces the proposition that debarment implicates a protected liberty interest only when it effectively eliminates the plaintiff's ability to find work in her field.

Martin next submits that debarment from an entire class of contracts—here, contracts with state agencies—can implicate a protected liberty interest. Doc. 50 at 25-27; Doc. 61. The point is questionable under governing precedent, but it would not help Martin even if it were correct because the complaint alleges, and Martin confirmed at the motion hearing, that Smart Elevators has contracts with "various state agencies." Doc. 1 at ¶ 25.

## Conclusion

Defendants' motions to dismiss are denied insofar as they seek dismissal under Rule 12(b)(1) and are granted insofar as they seek dismissal under Rule 12(b)(6). Martin's claims are dismissed on the merits without prejudice, and she has until May 17, 2022 to file an amended complaint. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). If Martin does not file an amended complaint, the dismissal will convert automatically to a dismissal with prejudice, and judgment will be entered.

April 26, 2022

_____
United States District Judge

14