UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUZY MARTIN, | ) |
| | ) |
| Plaintiff, | ) 21 C 5494 |
| | ) |
| vs. | ) Judge Gary Feinerman |
| | ) |
| SUSAN HALING, MICHELLE CASEY, DONALD EDWARDS, CHICAGO HOUSING AUTHORITY, MARK LISCHKA, MICHAEL MORAN, BOARD OF EDUCATION OF CITY OF CHICAGO, JONATHAN MAPLES, and DOES 1-10, | ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Suzy Martin brought this suit, alleging violations of her Fourteenth Amendment procedural due process rights, against Susan Haling, Michelle Casey, and Donald Edwards in their official capacities as Illinois state officials; the Chicago Housing Authority ("CHA") and two of its employees, Mark Lischka and Michael Moran, in their official and individual capacities; and the Board of Education of the City of Chicago and its employee, Jonathan Maples, in his official and individual capacity. Doc. 1. Defendants moved under Civil Rules 12(b)(1) and 12(b)(6) to dismiss the original complaint, and the court denied the Rule 12(b)(1) motions, granted the Rule 12(b)(6) motions, and allowed Martin to replead. Docs. 64-65 (reported at 2022 WL 1228233 (N.D. Ill. Apr. 26, 2022)). Martin filed an amended complaint. Doc. 68. Edwards and Haling again move under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction, and all Defendants again move under Rule 12(b)(6) to dismiss for failure to state a claim. Docs. 70, 72, 74, 76, 77, 79. The Rule 12(b)(1) motions are denied, the Rule 12(b)(6) motions are granted, and the case is dismissed with prejudice.

1

**Background**

In resolving a Rule 12(b)(1) motion asserting a facial challenge to subject matter jurisdiction, as in resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, but not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (Rule 12(b)(6)); *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (Rule 12(b)(1)). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Martin's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Martin as those materials allow. *See Domanus v. Locke Lord, LLP*, 847 F.3d 469, 478-79 (7th Cir. 2017). In setting forth the facts at this stage, the court does not vouch for their "objective truth." *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

A. **UIC "Shadow Debarment"**

Martin is the owner and president of Smart Elevators Co., an elevator service and repair company. Doc. 68 at ¶¶ 11, 25. From October 2010 through March 2016, Smart Elevators provided elevator and escalator services to the University of Illinois Chicago ("UIC"). *Id.* at ¶¶ 28-33. On October 16, 2015, the Office of the Executive Inspector General for the Agencies of the Illinois Governor ("OEIG") received a whistleblower complaint alleging that Martin and Smart Elevators participated in a bribery and kickback scheme in which a UIC procurement employee directed work to Smart Elevators and paid it for services that it did not provide. *Id.* at ¶¶ 3, 34-38.

The OEIG opened an investigation. *Id*. at ¶ 35. On March 4, 2016, UIC informed Smart Elevators that it could no longer provide elevator services for UIC. *Id*. at ¶ 44. On May 26, the OEIG referred its uncompleted investigation to the U.S. Attorney for the Northern District of Illinois. *Id*. at ¶ 45. The U.S. Attorney's Office asked the OEIG to suspend its investigation, which it did. *Id*. at ¶ 46. But after learning that Smart Elevators had bid on a contract to provide elevator repair services to UIC, the OEIG decided to issue a report "in order for UIC to be able to make an informed decision in its procurement process regarding Smart Elevators." *Id*. at ¶ 47.

The OEIG and the Illinois Executive Ethics Commission ("EEC")—the governmental body that publishes OEIG reports—issued a non-public version of the report on April 3, 2017, finding that Martin participated in a kickback scheme and recommending that UIC "terminate any existing contracts and work orders with Smart Elevators, and bar Smart Elevators, or any other business operated by Suzy Martin, from future UIC contracts or work." *Id*. at ¶¶ 48-49. In response to the report, UIC's Executive Director of University Ethics and Compliance stated that UIC would defer action on the report's recommendations until the OEIG concluded its investigation. *Id*. at ¶¶ 54, 64. According to Martin, UIC in fact decided to bar her and Smart Elevators from any UIC work based on the report, imposing what she calls a "shadow debarment." *Id*. at ¶¶ 64-65.

On May 2, 2018, the U.S. Attorney's Office issued a press release announcing federal bribery charges against Martin. *Id*. at ¶ 56. In January 2019, the EEC publicly released the OEIG report. *Id*. at ¶ 57. On February 22, 2019, after a four-day trial, a jury found Martin not guilty of all charges. *Id*. at ¶ 62. The OEIG and the EEC have nonetheless refused to withdraw the OEIG report, on which the UIC continues to rely to bar Martin and Smart Elevators from any UIC work, "directly or as a subcontractor." *Id*. at ¶¶ 63, 65. In January 2021, UIC employees

told a contractor that UIC would not award it any work if it used Smart Elevators as a subcontractor. *Id*. at ¶ 67.

> B.  **CHA and CPS Debarment**

In April 2019, a CHA contractor hired Smart Elevators as a subcontractor. *Id*. at ¶ 70. That month, the CHA Office of the Inspector General ("CHA OIG") learned of the OEIG report. *Id*. at ¶ 71. CHA OIG Investigator Mark Lischka contacted UIC's Executive Director of University Ethics and Compliance, who told him that UIC was not awarding Smart Elevators any contracts given the OIEG investigation and the federal criminal charges. *Id*. at ¶¶ 72-73. The CHA OIG concluded that there was "strong and sufficient evidence" that Martin and Smart Elevators had operated a kickback scheme, and it recommended that they be debarred from doing any business with CHA for three years. *Id*. at ¶ 74.

On October 16, 2019, Michael Moran, CHA's Chief Financial Officer and Acting Chief Procurement Officer, sent Martin a letter stating that CHA had determined that she and Smart Elevators were "non-responsible, and therefore, ineligible to enter into new contracts to perform services at CHA and CHA-related properties." *Id*. at ¶ 77. Smart Elevators's contracts with CHA were cancelled, and Martin and Smart Elevators remain ineligible to provide work to CHA. *Id*. at ¶ 79. In November 2020, Martin wrote to CHA's Chair of the Board of Commissioners asking that she clear Martin's name and reject the OEIG report's findings, but Martin never received a response. *Id*. at ¶ 78. Martin has since written to other CHA leaders as well. *Ibid*.

Smart Elevators began working as a subcontractor for Chicago Public Schools ("CPS") in 2017. *Id*. at ¶ 80. On January 22, 2020, Martin met with Jonathan Maples, the Chief Procurement Officer for the Chicago Board of Education, to discuss the OEIG report. *Id*. at ¶ 84. On February 23, 2021, Maples issued a Notice of Proposed Debarment and Interim Restraints to Martin and Smart Elevators. *Id*. at ¶ 85. Citing the OEIG report, the notice informed Martin and

4

Smart Elevators that they were immediately suspended from performing under any existing Board contract or subcontract, proposed that the Board's Chief Operating Officer impose interim constraints making them ineligible to obtain any new Board business, and recommended that the Board's Chief Operating Officer seek Board approval to permanently debar them. *Id*. at ¶¶ 86-87, 89. In response to the notice, Martin denied wrongdoing and requested a hearing before the Board, but no hearing was held. *Id*. at ¶ 90. Martin and Smart Elevators are currently treated as ineligible to perform work for CPS. *Id*. at ¶ 91.

      C.      **Smart Elevators's Other Contracts**

Before the OEIG report, Smart Elevators performed work for private entities, state agencies, and the federal government. *Id*. at ¶ 26. Eighty percent of Smart Elevators's contracts by revenue "were for state or municipal agencies in Chicago like UIC, CHA[,] or CPS—*either as a direct contractor or as a subcontractor* for other entities." *Id*. at ¶ 94 (emphasis added). In 2019 and 2020, Smart Elevators lost two subcontracts for municipal work in Chicago worth $2 million each and was stricken from bids that would have generated $14 million in subcontracts. *Id*. at ¶ 98. Two banks refused to continue to do business with Smart Elevators or Martin, and a third bank closed Martin's investment accounts. *Id*. at ¶ 102. Martin "has no *direct* contracts today with the State of Illinois or any of its agencies." *Id*. at ¶ 26 (emphasis added).

On March 6, 2019, shortly after Martin's acquittal, the U.S. Department of the Navy terminated the suspension that it had imposed on Martin and Smart Elevators. *Id*. at ¶ 69. In 2021, the U.S. Department of Justice awarded Smart Elevators a contract to perform elevator renovation services at the Metropolitan Correctional Center in Chicago. *Id*. at ¶ 68. Martin has also been awarded bids in other States, though not always for elevator work. *Id*. at ¶ 104.

D.   **Procedural History**

Martin's original complaint alleged, as does the operative complaint, that Smart Elevators currently has contracts with the Department of Justice and private entities, and that it is free to compete for contracts with the Department of the Navy. Doc. 1 at ¶¶ 25, 70-71. The original complaint also alleged that Smart Elevators has contracts with state agencies. *Id*. at ¶ 25. At the hearing on Defendants' motions to dismiss the original complaint, Martin confirmed that Smart Elevators performs work for state agencies. Doc. 61. In dismissing the original complaint, the court held that, "[g]iven these admissions, it indisputably is not 'virtually impossible for [Martin] to find new employment in [her] chosen field.'" 2022 WL 1228233 at *6 (second and third alterations in original) (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019)). "To the contrary," the court added, "Smart Elevators's success in securing contracts in the elevator service and repair industry—including with state and federal governmental clients—shows, as a matter of law, that Martin has not been deprived of any occupational liberty interest." *Ibid*. The court therefore dismissed Martin's procedural due process claims. *Ibid*.

The amended complaint alleges that Martin "has no *direct* contracts today with the State of Illinois or any of its agencies." *Id*. at ¶ 26 (emphasis added). It describes her "chosen field" as Smart Elevators's "state and municipal work in the Chicago area." *Id*. at ¶¶ 26, 96-97.

## Discussion

I.   **Article III Standing**

Edwards again argues that Martin lacks Article III standing because she seeks relief on behalf of only Smart Elevators and not on her own behalf. Doc. 71 at 10-11. The "irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*,

578 U.S. 330, 338 (2016) (citation and internal quotation marks omitted). As before, Edwards focuses on redressability. Doc. 71 at 10-11. "Redressability 'examines the causal connection between the alleged injury and the judicial relief requested.'" *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 501 (7th Cir. 2005) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). "On a motion to dismiss, a plaintiff need only plead 'that there is a "substantial likelihood" that the relief requested will redress the injury claimed.'" *Ibid*. (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978)).

Edwards's challenge to Martin's standing fails because the amended complaint seeks relief on her own behalf. As did the original complaint, the amended complaint alleges that the UIC, CHA, and CPS debarments extend to Martin and "any other business operated by [her]." Doc. 68 at ¶¶ 49, 74, 77, 86-87, 89. As the court previously explained, "[b]ecause there is a substantial likelihood that Martin's alleged injury—disqualification from operating a business that can compete for contracts at UIC, CHA, and CPS—would be remedied by an injunction lifting the debarments against her, she satisfies Article III's redressability requirement." 2022 WL 1228233 at *3; *see also Spokeo*, 578 U.S. at 338; *Lac Du Flambeau*, 422 F.3d at 501; *cf. Snitzer v. City of Chicago*, 2007 WL 3252822, at *7 (N.D. Ill. Nov. 1, 2007) (holding that the plaintiff lacked standing to challenge a stop work order issued against the plaintiff's company where "[t]he stop work order was not issued against [the plaintiff] personally").

Edwards contends that the court's prior opinion did not account for the fact that Martin "lacks standing to request any relief be conferred on Smart Elevators, a non-party." Doc. 71 at 10-11; Doc. 87 at 8. But because the "court is satisfied that [Martin]'s own financial interests are sufficiently implicated here to meet the constitutional standing requirements of injury, causation, and redressability[,] [w]hatever additional limitations might exist on h[er] ability to recover for

7

injuries to [Smart Elevators] are prudential, rather than jurisdictional, and relate [solely] to the merits of h[er] claims for relief." *Strauss v. City of Chicago*, 346 F. Supp. 3d 1193, 1202 (N.D. Ill. 2018) (citation omitted); *see also Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013) ("[T]he shareholder-standing rule is a prudential limitation and does not affect the court's authority to hear the case."); *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 777-78 (7th Cir. 1994) (noting that, where the plaintiffs had Article III standing, the issue of "whether [the plaintiffs] have a legal right to obtain damages for" injuries to their corporation "is a question about the merits").

## II. Eleventh Amendment

Edwards, Haling, and Casey also reassert their arguments that Martin's claims against them are barred by the Eleventh Amendment. Doc. 71 at 11-15; Doc. 78 at 6-7; Doc. 80 at 9-11. Although Edwards and Haling cast their Eleventh Amendment arguments as jurisdictional under Rule 12(b)(1), Doc. 71 at 11; Doc. 77, the Seventh Circuit "has clearly held that the question of sovereign immunity is not a jurisdictional one." *Meyers v. Oneida Tribe of Indians of Wis.*, 836 F.3d 818, 820, 822 (7th Cir. 2016) (noting that because "the question of sovereign immunity is not jurisdictional," the district court "properly treated the Tribe's motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) as a motion to dismiss for failure to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6)"); *see also Cooper v. Ill. Dep't of Hum. Servs.*, 758 F. App'x 553, 554 (7th Cir. 2019) ("[B]ecause the Eleventh Amendment does not curtail subject-matter jurisdiction, we modify the district court's judgment to reflect a dismissal for failure to state a claim with prejudice … .") (citation omitted); *Mutter v. Rodriguez*, 700 F. App'x 528, 531 (7th Cir. 2017) ("We end with a technical note. In dismissing this suit as barred by the Eleventh Amendment, the district court

treated the dismissal as jurisdictional. But a dismissal based on that amendment is on the merits and therefore with prejudice.").

The Eleventh Amendment "bars actions in federal court against a state, state agencies, or state officials acting in their official capacities." *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010). Interpreting the Eleventh Amendment, the Supreme Court held in *Ex parte Young*, 209 U.S. 123 (1908), that injunctive relief—but not monetary damages for past harms—is available in federal court against state officials sued in their official capacities. *See id.* at 159-60; *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521 (7th Cir. 2021) (explaining that *Ex parte Young* "applies only when a plaintiff seeks prospective relief against an ongoing violation of federal law," adding that "[i]njunctive relief is prospective relief" while "monetary damages to remedy past harms" is not) (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997)); *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1050-51 (7th Cir. 2013) (observing that a federal court cannot "direct a state to make payments … to remedy a past injury to a private party").

Edwards, the Chairman of UIC's Board of Trustees, reprises his argument that although Martin requests an injunction enjoining him from "enforcing any debarment" against Martin and Smart Elevators or from "canceling any existing contracts" with Smart Elevators, Doc. 68 at ¶ 128, "the primary relief [she] seeks is the payment of money from the state," Doc. 71 at 14. That argument fails for the same reasons the court offered in its first opinion. 2022 WL 1228233 at *4. The amended complaint, like the original, focuses on Martin's inability to compete for bids, and her requested relief correspondingly "seeks only that she and her company be eligible to perform future work." Doc. 84 at 39. And as before, the amended complaint does not request an injunction compelling any defendant to in fact enter any contract with Martin or to pay her.

Martin's injunctive relief claim against Edwards in his official capacity can therefore proceed under *Ex parte Young*. *See Driftless Area*, 16 F.4th at 521.

Edwards also renews his argument that "the relief [Martin] seeks requires the Court to infringe on Mr. Edwards' and [UIC]'s sovereign immunity to interpret and comply with state law regarding vendor contracts." Doc. 71 at 15. The court has already explained that Martin does not seek such relief, 2022 WL 1228233 at *4, and Edwards does not point to any new allegations in the amended complaint that would alter that conclusion. Indeed, Edwards acknowledges the court's prior holding and notes that he includes the argument "to preserve Mr. Edwards' appellate rights." Doc. 71 at 11 n.4. Although, as Edwards observes, certain Illinois statutes and regulations govern vendor debarment procedures for state agencies, Doc. 71 at 15 (citing 30 ILCS § 500/1-1 *et seq.*; 44 Ill. Adm. Code § 4.2005 *et seq.*), Martin alleges that UIC's "shadow debarment" process violated her federal due process rights, *not* Illinois's debarment rules, Doc. 68 at ¶¶ 122-128. Thus, as the court previously held, Martin's claims against Edwards do not impermissibly ask the court to direct UIC to comply with Illinois law. *See Bennett v. Tucker*, 827 F.2d 63, 71 n.3 (7th Cir. 1987) (noting that federal courts can adjudicate suits in which "the plaintiffs do not ground their claim on the defendant's alleged failure to comply with state law," but instead "allege that the defendant has refused to comply with the dictates of the Due Process Clause," and explaining that "existing state procedures may be relevant in determining the dictates of due process").

Casey, the Executive Director of the EEC, and Haling, the Executive Inspector General of the OEIG, again maintain that Martin's claims are barred by the Eleventh Amendment, but on new grounds. Doc. 78 at 6-7; Doc. 80 at 9-11.

10

For her part, Casey argues that because she does not have "some responsibility for supervising the challenged conduct," *Ex parte Young* does not apply. Doc. 80 at 10-11. "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Young*, 209 U.S. at 157; *see also Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir. 1992) (holding that *Ex parte Young* did not "support[] a suit against the Attorney General, who has never threatened the [plaintiffs] with prosecution and as far as we can tell has no authority to do so"). "To determine whether a state official has 'some connection' to the law's enforcement, courts look at the official's duties and powers under state law … ." *Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 914 (E.D. Wis. 2002) (citing *Sherman*, 980 F.2d at 441).

Casey does not dispute that the EEC is responsible for publishing the OEIG report; rather, she contends that her position as the EEC's Executive Director is an administrative role with duties "separate and apart" from the EEC under Illinois law. Doc. 80 at 10 (citing 5 ILCS 430/20-5(h)). But even assuming that her role is administrative, Casey does not cite any case for the proposition that the "some connection" requirement of *Ex parte Young* bars a suit against a high-ranking official of an agency that is responsible for the challenged conduct simply because the official's duties at the agency are administrative. To the contrary, in *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125 (8th Cir. 2019), the Eighth Circuit—albeit in the tribal sovereign immunity context—rejected the argument that the defendants' "supervisory and administrative duties" were not a "sufficient connection" to the challenged conduct for purposes

11

of *Ex parte Young*. *Id*. at 1131-32. Martin's claim against Casey is therefore permitted under *Ex parte Young*.

Contrary to Casey's submission, Doc. 85 at 6, *Sherman* does not warrant the opposite result. In *Sherman*, the plaintiffs sued the Attorney General of Illinois, among others, seeking a declaratory judgment that an Illinois statute was unconstitutional. 980 F.2d at 441. The Seventh Circuit held that the Eleventh Amendment barred the claim against the Attorney General, explaining that because the Attorney General had no authority to enforce the statute, the plaintiffs "apparently named the office of the Attorney General in an effort to obtain a judgment binding the State of Illinois as an entity." *Ibid*. Here, by contrast, the EEC is the state governmental entity responsible for taking the challenged action—publishing the OIEG report—so Martin, unlike the plaintiffs in *Sherman*, is not impermissibly "attempting to make the state a party" by naming Casey as a defendant. *Young*, 209 U.S. at 157.

Haling argues that the Eleventh Amendment does not permit Martin to ask that she "be enjoined from enforcing debarment or cancelation decisions made by CHA and CPS" because the OEIG is not responsible for those decisions. Doc. 78 at 6-7. Although the amended complaint names Haling as a defendant in the counts seeking relief from CHA and CPS, Doc. 68 at ¶¶ 129-153, Martin clarifies in her brief that the only relief she seeks as to Haling "is that the OEIG be enjoined from publishing the OEIG report and … from disparaging or damaging the reputations of Martin and her company," Doc. 84 at 37-38. Because Haling serves as the Executive Inspector General of the OEIG, seeking that relief does not violate the Eleventh Amendment.

### III. Merits of Martin's Procedural Due Process Claims

Like the original complaint, the amended complaint alleges that Defendants violated Martin's Fourteenth Amendment procedural due process rights by depriving her of her

"protected liberty interests in her continuing right to contract and work with UIC, CHA[,] and CPS." Doc. 68 at ¶¶ 113-115, 124-126, 136-138, 149-151. "A procedural due process claim requires a two-fold analysis. First, [the court] must determine whether the plaintiff was deprived of a protected interest; second, [the court] must determine what process is due." *Leavell v. Ill. Dep't of Natural Res.*, 600 F.3d 798, 804 (7th Cir. 2010) (internal quotation marks omitted). Among the liberty interests protected by due process is a person's right "to engage in any of the common occupations of life." *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972) (internal quotation marks omitted). To state a due process claim for the deprivation of an occupational liberty interest, a plaintiff "must [allege] that (1) [s]he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed[,] and (3) [s]he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001).

As to the third requirement, a plaintiff "suffer[s] a tangible loss of other employment opportunities" only when the defendant's stigmatizing conduct caused "the [plaintiff's] good name, reputation, honor or integrity [to] be called into question in a manner that makes it *virtually impossible* for the [plaintiff] to find new employment in h[er] chosen field." *Id*. at 670 (emphasis added); *see also Doe*, 928 F.3d at 661 ("Liberty interests are impinged when someone's good name, reputation, honor or integrity are called into question in a manner that makes it virtually impossible for him to find new employment in his chosen field.") (internal quotation marks and alterations omitted). The "virtually impossible" standard excludes from the scope of an occupational liberty claim defamatory conduct that "merely result[s] in reduced economic returns and diminished prestige," *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985), or that "even … causes serious impairment of one's future employment," *Khan v. Bland*, 630

13

F.3d 519, 534 (7th Cir. 2010) (internal quotation marks omitted). *See Santana v. Cook Cnty. Bd. of Rev.*, 679 F.3d 614, 621 (7th Cir. 2012) ("Defamation by the government [] does not deprive a person of a liberty interest protected by the Fourteenth Amendment, *even when it causes serious impairment of one's future employment*.") (internal quotation marks omitted); *McMahon v. Kindlarski*, 512 F.3d 983, 988 (7th Cir. 2008) ("[I]t is well-established that mere defamation, while it may be the basis for a solid claim based on state law, does not deprive a person of liberty protected by the Fourteenth Amendment. This is true even when the defamation causes serious impairment of future employment opportunities.") (citation omitted).

      The court dismissed the original complaint because it did not plausibly allege that Martin had been deprived of an occupational liberty interest given her allegation that Smart Elevators had "success in securing contracts in the elevator service and repair industry" with private entities, the Department of Justice, and state agencies. 2022 WL 1228233, at *6 ("Given these admissions, it indisputably is not 'virtually impossible for [Martin] to find new employment in [her] chosen field.'") (alterations in original) (quoting *Doe*, 928 F.3d at 661). The amended complaint makes substantially similar allegations, but it differs in two principal ways. First, it alleges that Martin "has no *direct contracts* today with the State of Illinois or any of its agencies." Doc. 68 at ¶ 26 (emphasis added); *compare* Doc. 1 at ¶ 25 ("Smart Elevators'[s] business *has* grown to include contracts with private entities, various state agencies[,] as well as the federal government."). Second, it alleges that Martin's "chosen field" is not elevator service and repair generally, but rather her "work for Chicago-area municipal and state public agencies, both as a direct contractor and sub-contractor," which comprised "80% of Smart Elevators'[s] contracts by revenue prior to the OIEG Report." Doc. 68 at ¶¶ 26, 94, 96-97; *compare* Doc. 1 at ¶ 24 ("Martin founded Smart Elevators, an elevator service and repair company serving the

Chicago area."). Martin argues that these new allegations allow her to satisfy the "virtually impossible" standard for occupational liberty due process claims. Doc. 84 at 25-30. Her argument is unpersuasive.

As an initial matter, the amended complaint's allegation that Martin currently has no "direct contracts" with state agencies gives rise to the necessary—not permissive, but necessary—implication that she still does work with state agencies as a subcontractor. Throughout the amended complaint, Martin repeatedly alleges that she and Smart Elevators worked both: (1) as a "contractor" or, put differently, under a "contract" or "directly" with clients; and (2) as a "subcontractor" or, put differently, under a "subcontract." Doc. 68 at ¶ 4 (alleging that Martin and Smart Elevators were "debarred from work" from certain governmental agencies "whether as a contractor of subcontractor"), ¶ 65 (alleging that UIC bars Martin and Smart Elevators "from any work, directly or as a subcontractor"), ¶ 70 (alleging that Smart Elevators was hired "as a subcontractor"), ¶ 80 (alleging that Smart Elevators "began working as a … minority subcontractor"), ¶ 87 (alleging that Martin and Smart Elevators were "suspended from performing under any existing Board contract or any subcontract to an existing Board contract"), ¶ 96 (alleging that Martin was barred from work "both as a direct contractor and sub-contractor"), 145 (same as ¶ 87) , 151 (same). Indeed, the amended complaint alleges that "[p]rior to the OEIG Report," Martin worked with state agencies "either as a direct contractor or as a subcontractor." *Id*. at ¶ 94.

Given this backdrop, the amended complaint's allegation that Martin "has no direct contracts today with the State of Illinois or any of its agencies," *id*. at ¶ 26, must necessarily be understood to convey that Martin continues to perform work for the State or its agencies as a subcontractor. There is no other plausible explanation for Martin's use of the modifier "direct"

15

before "contracts." In fact, when pressed on the issue at the motion hearing, Doc. 92, Martin acknowledged that she (or Smart Elevators) presently does subcontractor work for a state agency. Accordingly, it indisputably is not "virtually impossible for [Martin] to find new employment in [her] chosen field," *Doe*, 928 F.3d at 661—even accepting her narrow description of her "chosen field" as "state and municipal work in the Chicago area," Doc. 68 at ¶ 97.

The discussion could stop here, but it bears mention that settled precedent renders Martin's description of her "chosen field" a non-starter. As the Seventh Circuit has observed, "[i]t is the liberty to pursue a *calling or occupation*, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992); *see also Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 704 (7th Cir. 2001) ("The concept of liberty protected by the due process clause has long included occupational liberty—the liberty to follow a trade, profession, or other calling. The cases have consistently drawn a distinction, however, between occupational liberty and the right to hold a specific job.") (internal quotation marks and citations omitted).

For example, in *Wroblewski*, the city prevented the plaintiff, president of a company formed to operate the city's marina, "from obtaining *any* potential employment or subcontracting work in connection with the [c]ity's marina," requiring him "to leave Wisconsin for a period of time to obtain employment." 965 F.2d at 454-55. While recognizing that the plaintiff's exclusion "appear[s] to be more than displacement from a specific job," the Seventh Circuit held that it "d[id] not rise to a deprivation of occupational liberty." *Id*. at 455-56 (internal quotation marks omitted). The Seventh Circuit explained that the plaintiff's occupation "cannot be 'operating the Washburn marina facility,'" as "that is much closer to a specific job than an occupation." *Ibid*. ("[T]he sphere from which Wroblewski was excluded cannot properly be

16

called an 'occupation,' like the practice of law."). Illustrating the same principle in another case, the Seventh Circuit held: "[B]eing a police officer is an occupation; being a police lieutenant is not. Being a psychologist is an occupation; being a member of a hospital's medical staff is not." *Ill. Psychological Ass'n v. Falk*, 818 F.2d 1337, 1344 (7th Cir. 1987)); *see also Chicago United Indus., Ltd. v. City of Chicago*, 2007 WL 4277431, at *7 (N.D. Ill. Dec. 3, 2007) ("'[C]hosen occupation' [is] not customer-specific.").

The amended complaint alleges that Smart Elevators's elevator service and repair business "include[s] contracts with private entities, state agencies, as well as the federal government." Doc. 68 at ¶ 26. As in *Wroblewski*, Smart Elevators's contracts with state and municipal agencies in the Chicago area, while broader than one specific job, is too narrow to qualify as an occupation for purposes of discerning the scope of Martin's occupational liberty interest. Rather, for those purposes, Martin's occupation is the elevator service and repair business. *See Trevathan v. Walker*, 2008 WL 282204, at *6-7 (S.D. Ill. Jan. 31, 2008) (rejecting the plaintiff's contention that "exclusion from government nursing jobs is sufficient to establish the deprivation of a protectable liberty interest" as "tak[ing] too narrow a view" of his chosen field, noting that "nursing jobs" in the private sector, "albeit less desirable[,] … are still available to him"); *Chicago United Indus., Ltd.*, 2007 WL 4277431, at *7 (holding that the plaintiff supply company's debarment by a city, its "largest customer[,] d[id] not amount to the necessary deprivation" of an occupational liberty interest when the plaintiff was still "working in the supply-contract field"); *Abe's Free Flow, Inc. v. City of Mishawaka*, 55 F. Supp. 2d 908, 911-12 (N.D. Ind. 1999) (rejecting the plaintiff's claimed occupation of "performing video sewer inspections in the City of Mishawaka" as just "one job within the occupation of a plumbing business"). Thus, even if Martin can no longer do any business, whether as a contractor or

17

subcontractor, for state and municipal entities in the Chicago area, her continued work for private entities and the federal government, Doc. 68 at ¶¶ 5, 26, 68-69, 104, indisputably undermines the proposition that it is "virtually impossible" for her to find work in her chosen field as properly defined, thus defeating her due process claim as a matter of law. *Doe*, 928 F.3d at 661; *see Khan*, 630 F.3d at 533-35 (holding that the plaintiff's debarment from renting properties under a federal housing assistance program did not implicate a protected occupational liberty interest, reasoning that the plaintiff "could continue his occupation as landlord" given that he "could still rent to non-Section 8 housing tenants and participate in other state or government assistance programs").

In pressing the contrary result, Martin relies on *Kinney v. Anglin*, 2011 WL 1899345 (C.D. Ill. Apr. 25, 2011), *report and recommendation adopted*, 2011 WL 1899560 (C.D. Ill. May 19, 2011). Doc. 84 at 29-30. In *Kinney*, the plaintiff alleged that her being barred from "work in any prison in the state" deprived her of the liberty interest in pursuing her occupation of "teaching in a correctional institutional setting." *Id*. at *1, 5. Although the court held that the plaintiff stated a viable due process claim, it acknowledged that the plaintiff's description of her occupation was "relatively narrow." *Id*. at *5. Later, in granting summary judgment to the defendants, the court held that the plaintiff's description of her "chosen field" was "much too narrow" given that she had previously worked as an instructor outside of the correctional setting. *Kinney v. Anglin*, 889 F. Supp. 2d 1101, 1111 (C.D. Ill. 2012). Here, Martin admits that Smart Elevators performs elevator service and repair work for clients other than state and municipal agencies—namely, for private entities and the federal government. Doc. 68 at ¶ 26. *Kinney* thus reinforces the conclusion that Martin's characterization of her "chosen field" is too narrow.

Martin next argues that the amended complaint's allegation that three banks refused to continue to do business with her or Smart Elevators shows that she "has been harmed in all manner of business relationships." Doc. 84 at 30 (citing *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*, 132 F. Supp. 3d 98, 123 (D.D.C. 2015)). But Martin fails to explain how the loss of those banking relationships makes it "virtually impossible for her to find new employment in her chosen field." *Townsend*, 256 F.3d at 670. In *Community Financial Services*, the only case Martin cites to support her argument, the plaintiffs alleged not just a loss of banking relationships, but also that the loss "preclude[d] them from pursuing their chosen line of business" as payday lenders. 132 F. Supp. 3d at 123. Martin makes no such allegation here, nor would it be plausible for her to do so given her continued business operations.

In sum, Martin fails to state a viable occupational liberty claim because it is not virtually impossible for her to find work in the elevator service and repair field generally (her chosen field as properly framed) or for state and municipal entities in the Chicago area specifically (her unduly narrow description of her chosen field). Her due process claim accordingly is dismissed. *See Khan*, 630 F.3d at 527 ("An essential component of a procedural due process claim is a protected property or liberty interest.") (internal quotation marks omitted); *Wroblewski*, 965 F.2d at 457 ("Because Wroblewski has failed to allege facts that support a deprivation of his occupational liberty under the Constitution, his procedural due process claim fails.").

## Conclusion

Defendants' motions to dismiss are denied insofar as they seek dismissal on jurisdictional grounds under Rule 12(b)(1) and are granted insofar as they seek dismissal under Rule 12(b)(6) for failure to state a viable procedural due process claim. The dismissal is with prejudice. The court has already given Martin an opportunity to replead, and she has not overcome the flaw in

19

her due process theory identified in the court's earlier opinion. There is no reasonable basis to believe that Martin could cure that flaw by amendment—and her opposition brief does not request an opportunity to replead. *See Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("Nothing in Rule 15, nor in any of our cases, suggests that a district court must give leave to amend a complaint where a party does not request it or suggest to the court the ways in which it might cure the defects. To the contrary, we have held that courts are within their discretion to dismiss with prejudice where a party does not make such a request or showing."); *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) ("District courts … have broad discretion to deny leave to amend where there is … repeated failure to cure deficiencies, … or where the amendment would be futile.") (internal quotation marks omitted). Judgment will be entered in favor of Defendants and against Martin.

October 25, 2022                                              _____
                                                                         United States District Judge